**CITIZENS FINANCIAL SERVICES, FSB f/k/a Citizens Federal Savings and Loan Association, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 93–306C.

United States Court of Federal Claims.

July 17, 2003.

28

Salvatore Scanio, Washington, DC, for plaintiff.

Richard B. Evans, U.S. Department of Justice, Washington, DC, with whom were Stuart E. Schiffer, Deputy Assistant Attorney General, and Director David M. Cohen, for defendant.

**ORDER ON PLAINTIFF'S MOTION FOR CLARIFICATION OR, IN THE ALTERNATIVE, RECONSIDERATION**

FIRESTONE, Judge.

Plaintiff moved on July 10, 2003 for the court to clarify or reconsider its June 25, 2003 decision denying the plaintiff's claim for the cost of replacement capital. The plaintiff suggests that this court either misunderstood or misapprehended the statements at oral

argument by counsel, and that plaintiff's counsel did not waive, nor intend to waive plaintiff's cost of replacement capital claim. The plaintiff requests that the court clarify the portion of the opinion that discusses such waiver. The plaintiff did not ask for clarification or reconsideration of the second ground the court provided in denying the plaintiff's cost of replacement capital claim.

After reviewing the transcript, the court **GRANTS** the motion to clarify, but shall not reconsider its decision. The court believes that it may have misapprehended the plaintiff's argument, and, therefore, clarifies the opinion as follows:

- 57 Fed.Cl. at 71, last paragraph, first sentence should read: "Given the statements of counsel at argument, the court finds that the plaintiff's lost profit claim is the only viable claim. Where, as here, the claim for expectancy damages based on the cost of replacement capital exceeds the claim for lost profits, lost profits alone is the only appropriate expectancy claim.

  The court's conclusion is consistent with holdings of several other courts that have rejected a hypothetical cost of replacement capital model, when, in fact, the thrift pursued another strategy."

- Fed.Cl. at 72, second paragraph, first sentence should read: "In keeping with this consistent line of cases, Citizens' claim for replacement capital as a measure of its expectancy damages is rejected."

A corrected copy of the opinion will be provided to the parties.

**IT IS SO ORDERED.**

## OPINION

This matter comes before the court on the defendant's ("government's") motion for summary judgment on all of plaintiff Citizens Federal Savings and Loan Association's ("Citizens"') damage and restitution claims in this *Winstar*-related case. Also pending is Citizens' cross-motion for partial summary judgment on reliance damages. The government conceded the issue of liability and on May 1, 2002, plaintiff's motion for partial summary judgment on liability was granted.

For the reasons that follow, the government's motion for summary judgment is **GRANTED, IN PART, AND DENIED, IN PART.** The plaintiff's cross-motion for partial summary judgment on reliance is **DENIED.**

## BACKGROUND

### I. FACTS

In 1983, Citizens acquired two failing savings and loan associations, First Federal of East Chicago ("First Federal") and Gary Federal ("Gary"). The acquisitions were accomplished through mergers that were arranged by the Federal Savings and Loan Insurance Corporation ("FSLIC"). As part of the arrangement, the FSLIC gave Citizens $12.75 million in cash assistance. The FSLIC also agreed that Citizens could (a) mark down First Federal and Gary's assets to estimated market value; (b) count the $40.15 million of excess acquired liabilities over the market value of acquired assets as "supervisory goodwill;" (c) treat the supervisory goodwill as regulatory capital, to be written off on a straight-line basis over thirty-five years; and (d) record a direct credit of $12.75 million to its regulatory capital and amortize this "capital credit" over thirty-five years. The agreement between Citizens and the government therefore gave Citizens the right to use $52.9 million of supervisory goodwill and capital credit for regulatory capital purposes.

At the time of the acquisition of First Federal and Gary, Citizens needed the supervisory goodwill and capital credit in order to meet its regulatory capital requirement. By late 1989, around the time that the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (1989) ("FIRREA") was enacted, however, Citizens no longer needed to use the supervisory goodwill or capital credit to meet the then-applicable regulatory capital requirement. The Office of Thrift Supervisory ("OTS") 1989 examination report states that as of August 1989, Citizens had approximately $55.7 million in "regulatory capital," or 10% of total assets. The "regulatory capital" included $30 million in the "supervisory goodwill" capital remaining from the 1983

assistance acquisition and $10 million remaining from the amortization of the $12.75 million "capital credit." By virtue of Citizens' successful management, it had tangible capital of $15.1 million or 2.7% of assets.

Enactment and implementation of FIRREA led to changes in Citizens' ability to use supervisory goodwill and capital credit for regulatory capital purposes. At the time of FIRREA's implementation, Citizens had an unamortized balance of $38.5 million, which included $28.4 million of supervisory goodwill and $10.1 million of capital credit. Under FIRREA and its implementing regulations, the government required Citizens to deduct these amounts from its regulatory capital accounts on an accelerated basis and to eliminate them entirely by 1994. As a result, once FIRREA was implemented, Citizens' capital declined from over 10% of assets to less than 5.5% of assets.

## II. Damage Theories

While it is not disputed that Citizens' loss of supervisory goodwill did not interfere with its ability to meet its regulatory capital requirements.[1] Citizens contends, through its expert, Dr. Paul M. Horvitz, that Citizens was, however, damaged by the loss of its excess regulatory capital. In particular, Dr. Horvitz contends that Citizens was forced to forego both internal as well as external growth opportunities in order to rebuild its capital levels. Citizens' decision not to grow is reflected in its Investment Policies and Strategies document ("the Strategy") for 1990, which was adopted in August 1989, following enactment of FIRREA. The Strategy states:

> [S]ensible planning becomes ... complicated by the apparent abrogation of the Association's contract with the FSLIC on goodwill accounting.
>
> Currently, the Association's primary goal is to maintain capital levels well above all regulatory and other methods of measurement. To accomplish this, all savings and

lending products are priced to maintain adequate spreads for profitability and significant growth in assets. At the current time, a decrease in the deposit base is acceptable.

Pl.'s App. at 252. In keeping with this strategy, Citizens' contemporaneous business plans from the early 1990s reflect its decision to shrink loans by 3% and to not grow deposits. *Id.* at 386. Citizens' business plans called for additional loan shrinkage in 1993 and 1994. *Id.* at 320.

Citizens also decided that it could not grow by acquisition during this period of low capital ratios. For example, Citizens' 1991 Corporate Overview stated: "A local institution willing to merge will be explored only if there is no dilution of capital.... Historically, sales have brought serious diminishment of capital to acquiring institutions." *Id.* at 400–01. Citizens' decision not to grow by acquisition is also discussed in the OTS' 1992 examination of Citizens.

It is not disputed that by following its business strategy and plans, Citizens was able to achieve its goal of a 10% capital level by 1993 and thereafter began to use its net earnings to leverage and grow. By 1995, Citizens had grown from its pre-FIRREA $550 million to more than $600 million in assets, and by 1997, Citizens approached $750 million in assets. *Id.* at 34. In 1997, Citizens agreed to acquire another thrift, Suburban Federal Savings. In 1998, Citizens converted to stock ownership. Citizens raised $178 million in its initial public offering. *Id.* at 289. Of the amount raised, Citizens used $45.5 million to acquire Suburban and incurred $8.9 million in merger expenses.

It is against this backdrop that Dr. Horvitz proposes several alternative damage calculations.

### A. Expectancy Damages

Dr. Horvitz calculates expectancy damages under two approaches. First, under Dr. Horvitz' lost profit analysis, he concludes

---

[1]. It appears that the parties agree that Citizens had core capital of 5.36% of assets at the end of the first quarter of 1990, compared to the regulatory requirement of 3%. Citizens had been so profitable that it had earned at least 1% on assets each year from 1985–1992. Citizens' core capital increased to 6.48% by the end of 1990; 7.76% at the end of 1991; and 9.12% by the end of 1992.

that Citizens would have leveraged its unamortized goodwill and capital credit and obtained an additional $20.9 million in profits over what Citizens otherwise obtained until 1998, when Citizens acquired Suburban and was able to achieve the size it would have reached absent FIRREA. Second, Dr. Horvitz also presents a cost of capital replacement analysis in which he asserts that had Citizens decided to replace its lost goodwill and capital credits, it would have cost Citizens $31.1 million to replace the $30.4 million of disallowed supervisory goodwill and capital credit remaining after FIRREA. Although Dr. Horvitz acknowledges that Citizens had elected not to replace the lost regulatory capital, he opines that if Citizens had done so it would have issued preferred stock because preferred stock would have been the cheapest substitute.

The government challenges the assumptions and results of Dr. Horvitz' expectancy damage analysis with a report by Professors Bernard Black and Jeffrey Zwiebel. With respect to Dr. Horvitz' lost profits analysis, Professors Black and Zwiebel, taking into account various adjustments, conclude that the profits Citizens may have lost are those relating to additional assets that Citizens would have obtained had it been able to grow as planned. In this connection, Professors Black and Zwiebel state:

> We do not claim that Citizens would have earned a zero rate of return on incremental assets [i.e. those generated by additional growth].... But our analysis shows how speculative and inflated Dr. Horvitz' estimates of lost accounting profits are. By making alternative and quite reasonable assumptions, we can almost completely eliminate these supposed lost profits.

Def.'s App. at 119.

In response to Dr. Horvitz' contention that it would have cost Citizens $31.1 million to replace its lost regulatory capital, Professors Black and Zwiebel claim that at the time of FIRREA, Citizens no longer needed supervisory goodwill nor capital credits to meet Citizens' regulatory capital requirements and, therefore, "Citizens did not need to raise capital to be in regulatory compliance." *Id.* at 105. In such circumstances, Professors Black and Zwiebel contend that Citizens cannot make a claim for replacement capital. In the alternative, Professors Black and Zwiebel opine that to the extent Citizens replaced the lost regulatory capital, Citizens should only be entitled to its transaction costs or 6% of the amount to be replaced ($30 million). Professors Black and Zwiebel calculate that the cost of replacing regulatory capital would be approximately $1.8 million. *Id.* at 80.

### B. Restitution and Reliance

In the alternative, Dr. Horvitz posits that Citizens is entitled to restitution in the amount of $40.15 million, which is equal to the $52.9 million in liabilities Citizens acquired, less the $12.75 million in FSLIC cash assistance. Dr. Horvitz contends that this amount accurately measures the benefits conferred by Citizens on the government as a result of the contract. According to Dr. Horvitz, restitution may be properly measured by the amount of "liabilities" assumed and paid by Citizens. Dr. Horvitz contends that the benefit to the government can also be measured by the fact that it did not have to provide additional cash assistance to Citizens, because Citizens was willing to accept supervisory goodwill and capital credit in lieu of additional assistance. Dr. Horvitz calls this measure of restitution the Ruback/Heggestad approach, for the two academics Professor Richard Ruback of Harvard University and Professor Arnold Heggestad of the University of Florida, who have presented their model in other *Winstar* cases.

Dr. Horvitz also opines that Citizens is entitled to $40.15 million in reliance damages based on the same equation employed in calculating restitution damages. Dr. Horvitz argues this amount encompasses the net costs incurred by Citizens as a result of the contract and the government's breach. Dr. Horvitz further states that Citizens obtained no benefits from the its acquisition of First Federal and Gary and, therefore, Citizens is entitled to the full $40.15 million of liabilities it assumed and paid. Specifically, Dr. Horvitz concludes: "[I]t is my opinion that the assets and liabilities Citizens acquired in the transaction generated net losses for years

following the transaction, leading to a cumulative net loss by the time of the breach in 1989." *Id.* at 20.

Professors Black and Zwiebel challenge Dr. Horvitz' assumption that a rational investor would value $40 million in supervisory goodwill the same as $40 million in cash. They claim that the parties involved in the 1983 transaction focused on the $12.75 million cash assistance, acknowledging that the supervisory goodwill was worth much less than the cash. Professors Black and Zwiebel argue that Citizens only assumed the $40 million in liabilities because it expected to earn a profit by doing so: "If Citizens really believed that it was acquiring $40.15 million more in net liabilities than net assets, it must have believed that it was also acquiring an equal amount of other, perhaps intangible assets . . . ." *Id.* at 120–21. Professors Black and Zwiebel then go on to "roughly estimate" the net profit Citizens received from acquiring First Federal and Gary, which they conclude is between $40–45 million. *Id.* at 125. Based on this analysis, Professors Black and Zwiebel assert that Dr. Horvitz' restitution and reliance theory is unsupported because it is based on the "ridiculous claim that Citizens got no benefit at all from the acquisition, and thus suffered a net $40 million loss." *Id.* at 126. Professors Black and Zwiebel also challenge Dr. Horvitz' contention that Citizens actually paid the $40 million in assumed liabilities. *See id.* at 731–47.

## DISCUSSION

### I. Standard of Review

Summary judgment is appropriate where there is "no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Rules of the United States Court of Federal Claims 56(c); *Golden Pac. Bancorp v. United States*, 15 F.3d 1066, 1071 (Fed.Cir.1994); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987). No genuine issue of material fact exists when a rational trier of fact could only arrive at one reasonable conclusion. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Thus, if the nonmoving party produces sufficient

evidence to raise a question that would alter the outcome of the case, summary judgment must be denied. In making this determination, the court is mindful that any doubt over a factual issue must be resolved in favor of the nonmoving party. *Id.* at 587–88, 106 S.Ct. 1348.

The party moving for summary judgment has the burden initially of pointing out the absence of any genuine disputes of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant discharges this burden, the non-movant must demonstrate specific facts showing a genuine dispute of fact for trial. *Matsushita Elec.*, 475 U.S. at 586–87, 106 S.Ct. 1348; *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed.Cir.1994). Thus, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548; *see also Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("[T]he object of [Rule 56(e)] is not to replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit."); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In this connection, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*, 475 U.S. at 586, 106 S.Ct. 1348.

### II. Restitution

The government contends that the Court of Appeals for the Federal Circuit's holdings in *LaSalle Talman Bank, FSB v. United States*, 317 F.3d 1363 (Fed.Cir.2003), *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374 (Fed.Cir.2001) and *Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342 (Fed. Cir.2001) dictate the dismissal of plaintiff's claim for restitution. The court agrees. In *LaSalle Talman*, the Federal Circuit rejected the precise argument that the plaintiffs make here. LaSalle argued that restitution could be properly measured by the liabilities

it assumed as part of its acquisition of a failing institution because "Talman was obligated to pay the assumed liabilities as they became due and did so pay . . . before the breach." *LaSalle Talman,* 317 F.3d at 1376. The Federal Circuit nonetheless concluded that restitution based on these "assumed liabilities" is not a valid measure of restitution, primarily because the accounting liabilities assumed by Talman did not provide the government with a tangible benefit, such as a cash infusion into the acquired institution. Thus, the Federal Circuit concluded:

> [T]he calculation of restitution damages based on the treatment of assumed "goodwill" liabilities as a cost of performance was generally resolved in *Glendale,* 239 F.3d at 1382–83, where this court held that damages are not properly keyed to "a liability that was at most a paper calculation." Although the assumed liabilities are indeed an accounting cost, as LaSalle stresses, we agree with the Court of Federal Claims they are not a usable measure of either cost to the thrift or benefit to the government, and thus not an appropriate threshold for restitution damages. *See also Cal. Fed. Bank,* 245 F.3d at 1351.

*Id.* at 1376.

■ Citizens' attempts to distinguish this case from *LaSalle Talman* are not persuasive. The principle of restitution is to return to the non-breaching party the benefit it conferred on the breaching party less any benefits received by the non-breaching party. *See Glendale,* 239 F.3d at 1380–81. While the government no doubt received some benefit from Citizens' agreement to acquire First Federal and Gary, the benefit is not equal to the amount of assumed liabilities. Indeed, it is impossible to determine the benefit to the government from Citizens' assumption of First Federal and Gary's liabilities in that it was never certain that the

government would ever have had to absorb those liabilities. First, it is not disputed that had Citizens decided not to acquire First Federal and Gary, other banks were likely to step in and acquire them. For example, the record demonstrates that Great American Bank was also interested in acquiring First Federal and Gary.[2] Thus, Citizens' assumption that without its intervention, First Federal and Gary would have been liquidated and the government would have had to pay the cost, is unsupported. Second, restitution based on assumed liabilities is not a viable measure because, contrary to Citizens' contentions, Citizens did not permanently relieve the government of its responsibility for the net liabilities of First Federal and Gary. The government's insurance fund remained contingently liable in the event Citizens failed. *See id.* at 1382.

■ In sum, restitution based on the amount of assumed net liabilities simply does not properly measure the benefit to the government in this case and has been consistently rejected, in similar cases, on summary judgment. *See Franklin Fed. Sav. Bank v. United States,* 55 Fed.Cl. 108, 120 (2003) (Court granted government summary judgment with respect to restitution claim in amount of net liabilities assumed, stating "the remedy of restitution is as ill-suited in this case as it was in *Glendale.*"); *Fifth Third Bank of W. Ohio v. United States,* 55 Fed.Cl. 223, 244–45 (2003) (Court granted government summary judgment, finding that "Federal Circuit precedent is unwavering that restitution cannot be measured by aggregating the net liabilities of a failing thrift acquired in a supervisory merger."). In these circumstances, Citizens' claim for restitution, which for the reasons set forth above, is not based on a useable measure, must be rejected.[3] The government is entitled to summary judgment on Citizens' claim for restitution.

---

2. The record reveals that prior to approving the Citizens' proposal to acquire First Federal and Gary, the Federal Home Loan Bank Board was also negotiating with Great American. *See* Pl.'s ` App. at 212–13; 229–30.

3. Citizens also argues that restitution can be measured by the value to the government of not having to provide additional assistance to the transaction, based on the Ruback/Heggestad

model. Citizens does not, however, offer any calculation or support for this theory. In any event, the Ruback/Heggestad model also must be rejected on the same grounds as Citizens' claim for restitution based on assumed liabilities. The purpose of restitution is to return the plaintiff to where it would have been before the contract. *Glendale,* 239 F.3d at 1380–81. Thus, restitution is designed to take from the breaching party the

### III. Reliance Damages

█ The government argues that Citizens' claim for reliance damages, which is also based on the amount of net liabilities assumed, must also be dismissed as a matter of law. While the government acknowledges that reliance damages are available in *Winstar* cases, the government argues that Citizens' approach to reliance damages must be rejected as a matter of law. In particular, the government argues that under the Federal Circuit holding in *Glendale*, reliance damages must be based on "actual losses" and that assumed liabilities are not actual losses. The government further argues that in a recent decision, this court expressly rejected on summary judgment reliance claims based on "net liabilities assumed." *See Fifth Third*, 55 Fed.Cl. at 245–46. Finally, the government argues that Citizens' reliance claim is not factually supported. The government's experts, Professors Black and Zwiebel, calculate that Citizens did not sustain a loss in acquiring First Federal and Gary. To the contrary, they calculate that Citizens received a $40–45 million net profit from acquiring First Federal and Gary.[4]

Citizens argues, in response, that the court should hold that reliance damages can be properly based on the amount of net liabilities assumed by the acquiring institution, less any benefit it received. According to Citizens, where as here, it is alleged that the assumption of liabilities was a real "economic cost" and not simply a paper loss, Citizens must be given the opportunity to show that it sustained an actual loss when the breach occurred. While Citizens concedes that it is only entitled to its "net loss" and thus any loss must be offset by any benefit Citizens received from the acquisition of First Federal and Gary, it argues that the burden is on the government to establish the benefit Citizens received. Citizens contends that this court should not reject its reliance claim simply because there are issues of fact in dispute surrounding the amount of benefit Citizens received from acquiring First Federal and Gary.

Citizens contends that the court should deny summary judgment to the government, but instead grant Citizens partial summary judgment on its reliance claim. Citizens argues that under the facts of this case it is undisputed that Citizens assumed a real "economic cost," when it assumed the net liabilities of First Federal and Gary. Citizens asks that the court recognize that fact and then leave for trial the issue of "offsets," or benefits Citizens obtained from the acquisition. In particular, Citizens acknowledges that the court must resolve whether Citizens ultimately obtained a $40–45 million net profit from the acquisition of First Federal and Gary, as the government's experts contend, or obtained no benefit as Dr. Horvitz, contends. At argument, Citizens counsel explained that all of the profit Citizens obtained following the acquisition of First Federal and Gary was attributable to Citizens' assets prior to its acquisition of First Federal and Gary.

There is no doubt that the Federal Circuit has approved of reliance damages in *Winstar* cases. In *Glendale*, 239 F.3d at 1383, the Circuit stated that reliance damages "provide a firmer and more rational basis than the alternative theories argued by the parties." It is also true that, in *Glendale*, reliance damages were not based on assumed liabilities but on specific costs incurred by the plaintiff as a result of the breach. This does not mean, however, that the *Glendale* factors are the only factors to consider in determining reliance damages. As this court recently explained in *Franklin Fed.*, 55 Fed.Cl. at

---

actual benefit the breaching party received from the non-breaching party. Whether the government would have had to provide more cash assistance in order to secure the acquisitions of First Federal and Gary is not known. The court cannot base a restitution award on pure speculation. *Id.* at 1382.

4. As discussed in the statement of facts, Professors Black and Zwiebel stated that Citizens' net profit would have equal the sum of "(a) the additional cash profit [Citizens] earned from the acquisition through year-end 1989 (estimated ... at $15 million); plus (b) the present value at year-end 1989 of expected future cash profit from the acquisition, measured at the date of breach (estimated ... to be at least $15 million); plus (c) FSLIC's initial $12.75 million cash assistance payment. Summing these three items produces a crude estimate of net profit of $40–45 million ...." Def.'s App. at 125.

120–21, reliance damages may be based on the assumption of net liabilities in appropriate cases. Thus, if Citizens can establish that it incurred an actual economic cost when it assumed the net liabilities of First Federal and Gary, and that the cost was not completely offset by the benefit it received from acquiring First Federal and Gary, Citizens may be entitled to reliance damages. *See* Dan B. Dobbs, *Dobbs on Remedies* § 12.3(1) (2nd ed. 1993) ("The reliance damages recovery is a recovery for *net* reliance loss, so that the defendant is credited with any benefit the plaintiff receives from the expenditures in reliance.").[5]

Given the material facts in dispute over whether Citizens actually paid First Federal and Gary's net liabilities and then whether the acquisition of First Federal and Gary resulted in a net loss or net benefit for Citizens, the court is precluded from granting summary judgment for either side at this time. Citizens' reliance damage claim will have to be resolved at trial. The government's motion for partial summary judgment on Citizens' reliance claim is denied and Citizens' motion for partial summary judgment on its reliance claim is denied.

## IV. Expectancy Damages

The government also seeks summary judgment with regard to Citizens' claim for expectancy damages. As discussed above, Citizens' expert presented two methods for calculating Citizens' expectancy damages. Dr. Horvitz presented a cost of replacement capital model and then a lost profits model. Each will be examined in turn.

### A. Cost of Replacement Capital

█ As set forth in his expert report, Dr. Horvitz concludes that, although Citizens did not replace the supervisory goodwill and capital credit it had received as part of the acquisition of First Federal and Gary, had

Citizens elected to replace that capital, it would have cost Citizens $31.1 million. Dr. Horvitz acknowledges that this amount is larger than the $20.9 million of lost profits Dr. Horvitz calculated. At argument, Citizens' counsel explained that Citizens is not seeking $31.1 million. Rather, counsel explained that Dr. Horvitz' replacement capital calculation demonstrates that Citizens had correctly determined that it was not economically sound to replace the lost regulatory capital and that Citizens had properly elected to reach its capital goals by shrinking:

> Professor Horvitz says, [the cost of replacement capital] is $30 million. Los[t] profits in my model are $20 million. This supports the mitigation point, that the most cost-effective mitigation way was through forgoing growth.... They stood in place; they shrunk .... [Professor Horvitz] says, because this is $30 million, which is more than $20 million, what they did was the most cost-effective mitigation approach, and damages are 20, not 30. Even under the cost to replace model, damages are still 20, the los[t] profits.

Tr. at 130–31.

Given the statements of counsel at argument, the court finds that the plaintiff's lost profit claim is the only viable claim. Where, as here, the claim for expectancy damages based on the cost of replacement capital exceeds the claim for lost profits, lost profits alone is the only appropriate expectancy claim.

The court's conclusion is consistent with holdings of several other courts that have rejected a hypothetical cost of replacement capital model, when, in fact, the thrift pursued another strategy. For example, the trial court in *LaSalle Talman Bank, FSB v. United States* rejected a hypothetical replacement capital model stating: "[I]t is particularly inappropriate to resort to a *hypothetical* and *unreasonably expensive* method

---

5. In addition, it is also generally recognized that reliance damages should not exceed plaintiff's expectancy interest. *See Dobbs* § 12.3(2) ("[T]he plaintiff should not be better off by reason of breach than he would have been upon full performance."). Here, Citizens has claimed approximately $40 million in reliance damages and approximately $20 million in lost profits. Citizens' counsel conceded at oral argument that Citizens recognizes that its expectancy interest should serve as a "cap" on its reliance claim. Tr. at 98 ("I think damages would be limited by an expectancy award, the benefit of the bargain. So, the $20 million would make Citizens whole and that would be the limit on any reliance or restitution.").

of replacing capital when the record shows the actual method of mitigation chosen by [the thrift].... [P]laintiff's damages should be calculated on the basis of the *actual* means by which it filled its capital deficit." 45 Fed.Cl. 64, 103 (1999) (emphasis added), *aff'd in part, vacated in part by LaSalle Talman,* 317 F.3d 1363. On appeal, the Federal Circuit did not disturb the trial court's conclusion. *LaSalle Talman,* 317 F.3d at 1375. Similarly, in *Columbia First Bank, FSB v. United States,* 54 Fed.Cl. 693, 699 (2002), the trial court rejected a hypothetical cost of replacement capital model that is virtually identical to the one proposed by Dr. Horvitz, stating:

> Both the breach and the economic conditions were the realities plaintiff faced and the decision to forego raising capital was a business decision designed to address both. In this case, plaintiff both behaved reasonably and did not incur the cost of replacing capital. Plaintiff may have been damaged, and even badly damaged, by the breach, but the damage was neither caused nor increased by mitigation costs, and the court sees no reason to use hypothetical mitigation costs as a measure of damages now.

The court reached this same result in *Franklin Fed.,* 55 Fed.Cl. at 138, in which the court also rejected a cost of replacement model similar to the one presented in this case on summary judgment.

Finally, in *Fifth Third,* another similar cost of replacement model to that posited by Dr. Horvitz in this case was rejected by the court. In rejecting Fifth Third's claim for the hypothetical cost of replacement capital, the court stated: "The Court of Federal Claims has rejected the theory that models for preferred stock can be used to calculate the cost of replacement capital for goodwill lost through the enactment of FIRREA." *Fifth Third,* 55 Fed.Cl. at 243.

In keeping with this consistent line of cases, Citizens' claim for replacement capital as a measure of its expectancy damages is rejected. The defendant is therefore entitled to summary judgment on Citizens' claim for cost of replacement capital.

## B. Lost Profits

■ The court now turns to Citizens' lost profit claim. The government acknowledges that "the Court of Federal Claims has 'struggled' with the issue of granting summary judgment with regard to lost profits claims in the *Winstar* cases." Def.'s April 11, 2003 Rep. Br. at 10.[6] Nonetheless, the government contends that summary judgment is appropriate here because Citizens has failed to identify with specificity how Citizens lost any profit following FIRREA. In particular, the government contends that to establish lost profits, Citizens had to show what specific investment opportunities were lost following implementation of FIRREA. *See* Def.'s May 16, 2003 Rep. Br. at 20 ("Citizens failed to present contemporaneous evidence concerning actual lost investment opportunities, summary judgment is ... appropriate."). The government argues that the present case is similar to *Fifth Third,* 55 Fed.Cl. at 242, in which the court granted summary judgment to the government on the grounds that, absent evidence of "what investments plaintiff would have made or activities in which it would have engaged in a hypothetical world without FIRREA and with its competitors restored to the real-world banking environment," proof of damages was too remote to support a lost profits claim.

Citizens argues that the government is wrong on the facts and that Citizens did submit extensive contemporaneous evidence, including pre-breach and post-breach business plans, investment policies and strategies, other financial records, and internal government regulatory records, deposition testimony, expert analysis and testimony to how Citizens lost profits following enactment of FIRREA. Citizens contends that the government is imposing an "absolute certainty" test on the measurement of damages that is not required. Citizens notes that in *Energy*

---

6. Following the Federal Circuit's ruling in *Cal Fed,* the Court of Federal Claims, in numerous *Winstar*-related cases, including *Citizens Fed. Bank, FSB v. United States,* 52 Fed.Cl. 561

(2002), *Columbia First Bank,* 54 Fed.Cl. 693, and *Franklin Fed. Sav.,* 55 Fed.Cl. 108 has denied summary judgment to the government on those *Winstar*-related plaintiffs' claims for lost profits.

*Capital Corp. v. United States,* 302 F.3d 1314 (Fed.Cir.2002), the Federal Circuit plainly rejected an absolute certainty test. In *Energy Capital,* the Circuit stated, "certainty [of damages] is sufficient if the evidence adduced enables the court to make a fair and reasonable approximation of the damages. In circumstances such as these we may act upon probable and inferential as well as direct and positive proof." *Id.* at 1329 (quoting *Locke v. United States,* 151 Ct.Cl. 262, 283 F.2d 521, 524 (1960)). "Reasonable certainty," Citizens argues, is an inherently factual element that is not readily susceptible to summary disposition. *See Bluebonnet Sav. Bank, FSB v. United States,* 266 F.3d 1348, 1356–57 (Fed.Cir.2001) (reversing trial court's post-trial denial of expectancy damages for failure to meet reasonable certainty test).

The court agrees with Citizens that the government is not entitled to summary judgment on the issue of lost profits. Contrary to the government's assertions, Citizens has identified evidence to show that the government's breach interrupted Citizens' plans to expand its traditional thrift business of raising retail deposits and investing in safe, mortgage-type assets and investment securities. Citizens' pre-FIRREA business plans indicated that it intended to increase growth of both assets and deposits. Citizens' business plans following enactment of FIRREA show that Citizens embarked on a program to rebuild its capital by foregoing deposit growth. *See* Pl.'s App. at 320, 386. Similarly, Citizens had to put on hold its plans for external growth. For example, when asked, Professor Horvitz testified:

> Q. Doctor, are you aware of any growth opportunities that you believe Citizens had to pass up in the 1990s due to the loss of regulatory capital?
>
> A. Sure. There were—there were lots of—as I indicated, of [Resolution Trust Corporation ("RTC")] transactions available, which they would have been a logical and qualified buyer if they had the capital cushion that they wanted.

*Id.* at 740.

Dr. Horvitz' statement is confirmed in Citizens' 1991 Corporate Overview Statement, which states: "Mergers will be limited .... Although RTC acquisitions have been evaluated in the past, future explorations will be minimal. Historically, sales have brought serious diminishment of capital to acquiring institutions." *Id.* at 401. The OTS Examiners 1990 report further states: "[M]anagement is actively discussing purchasing another association, however, they do not want to adversely impact capital in any way." *Id.* at 636.

In these circumstances, this case is plainly distinguishable from *Fifth Third,* 55 Fed.Cl. at 240–41, in which the plaintiffs' expert in that case could not identify any opportunities for growth that were available and then lost by virtue of the breach caused by FIRREA. Here, Citizens has identified sufficient evidence to present genuine issues of material fact as to both the existence and amount of lost profits. Accordingly, the government's motion for summary judgment regarding Citizens' claim for lost profits is denied.

## CONCLUSION

In view of the foregoing, the government's June 4, 2002 motion for summary judgment as to restitution damages and cost of replacement capital is hereby **GRANTED.** However, because genuine issues of material facts exist as to the plaintiff's claim for reliance damages and lost profits, the government's June 4, 2002 motion for summary judgment as to reliance damages and lost profits is hereby **DENIED.** The plaintiff's August 2, 2002 cross-motion for partial summary judgment as to reliance damages is hereby **DENIED.**

The court will contact the parties before **Monday, July 7, 2003** to schedule a conference call during which the court will set the trial date and schedule pretrial submissions.