CITIZENS FINANCIAL SERVICES, FSB
f/k/a Citizens Federal Savings and
Loan Association, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 93–306C.

United States Court of Federal Claims.

March 7, 2005.

Salvatore Scanio, Washington, DC, for plaintiff.

Richard B. Evans, U.S. Department of Justice, Washington, DC, with whom were Stuart E. Schiffer, Deputy Assistant Attorney General, and Director David M. Cohen, for defendant. Brian L. Owsley and John H. Roberson, U.S. Department of Justice, of counsel.

## OPINION

FIRESTONE, Judge.

### INTRODUCTION

Liability in this *Winstar*-related litigation was not contested by the government and on May 1, 2002, the court granted the plaintiff's motion for partial summary judgment on the issue of liability. Thereafter, the plaintiff, Citizens Federal Savings and Loan Association ("Citizens") and the government cross-moved for summary judgment on the issue of damages. The background facts of the case are discussed at length in the court's June 25, 2003 initial opinion on damages, in which the court granted in part and denied in part the parties' respective motions for summary judgement. *Citizens Financial Services v. United States*, 57 Fed.Cl. 64 (2003).

As set forth in the June 25, 2003 opinion, Citizens' claims for damages stem from the agreement that it made with the Federal Savings and Loan Insurance Corporation ("FSLIC") during the savings and loan crisis of the 1980s. Under the terms of the agreement, Citizens acquired two failing savings and loan associations, First Federal of East Chicago and Gary Federal. The agreement included a provision granting $12.75 million in cash assistance to Citizens and provided that Citizens could:

> (a) mark down First Federal and Gary's assets to estimated market value; (b) count the $40.15 million of excess acquired liabilities over the market value of acquired assets as 'supervisory goodwill;' (c) treat the supervisory goodwill as regulatory capital, to be written off on a straight-line basis over thirty-five years; and (d) record a direct credit of $12.75 million to its regulatory capital and amortize this 'capital credit' over thirty-five years. The agreement between Citizens and the government therefore gave Citizens the right to use $52.9 million of supervisory goodwill and capital credit for regulatory capital purposes.

*Citizens*, 57 Fed.Cl. at 65.

As further discussed in the court's initial damages opinion, following enactment and implementation of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (1989) ("FIRREA"), Citizens had to change the way it used its supervisory goodwill and capital credit for regulatory purposes. In particular, under FIRREA and its implementing

regulations, Citizens had to deduct its unamortized $28.4 million of supervisory goodwill and $10.1 million of capital credit from its regulatory capital accounts on an accelerated basis, eliminating them entirely by 1994. As a result, once FIRREA was implemented, Citizens' regulatory capital declined from 10% of assets to less than 5.5% of assets. Importantly, however, at all times following the implementation of FIRREA, Citizens exceeded all regulatory capital requirements. Consequently, the parties agree that, following the implementation of FIRREA, Citizens needed neither supervisory goodwill nor its capital credit to meet FIRREA's new regulatory capital requirements.

Although Citizens did not need its supervisory goodwill or capital credit to meet the new regulatory capital requirements set forth in FIRREA, it nonetheless contended that it had suffered damages when it lost the right to count these items as capital. Citizens charged in its complaint that it was entitled to $40.15 million based on restitution and reliance theories. In the alternative, it claimed that it was entitled to $20.9 million in lost profits.[1] The government sought summary judgment on all of Citizens' damages theories. Citizens sought partial summary judgment on its reliance damages claim. In support of its motion and in defense to the government's motion, Citizens relied primarily on the report of Professor Paul M. Horvitz[2], who later became Citizens' trial expert. In support of its motion, the government relied primarily on the report of Professors Bernard Black and Jeffrey Zwiebel.[3] Professors Black and Zwiebel later became the government's trial experts.

In its summary judgment decision, the court granted the government's motion for summary judgment on Citizens' restitution claim for $40.15 million. The court denied the parties' cross motions for summary judgment on Citizens' reliance damage claim; however, Citizens voluntarily dismissed its reliance damage claim before trial.[4] Finally, the court denied the government's motion for summary judgment on Citizens' claim for lost profits based on lost business opportunities.

As discussed in the summary judgment decision, the court found, with respect to Citizens' lost profits claim, that there were disputed issues of material fact which precluded summary judgment. In particular, Citizens presented evidence, including Professor Horvitz's expert report, to establish that, immediately before FIRREA was enacted, Citizens had reached a 10% regulatory capital goal and was ready to begin an aggressive growth strategy. Professor Horvitz explained that because Citizens lost the use of goodwill and the capital credit after FIR-

1. Citizens also contended that it was entitled to $31.1 million, which Citizens claimed would have been the cost of replacing the regulatory capital it lost following the enactment of FIRREA. Eventually, Citizens abandoned its claim for damages on this basis. *Citizens*, 57 Fed.Cl. at 71.

2. Professor Horvitz holds a Ph.D. in Economics from the Massachusetts Institute of Technology ("MIT"). He worked at the Federal Reserve Bank of Boston as a financial economist and, later, at the Office of the Comptroller of the Currency and the Federal Deposit Insurance Corporation, where he attained the position of deputy to the chairman. Subsequently, Professor Horvitz became a professor of financial markets, financial institutions, and management of financial institutions at the University of Houston. He has been accepted as an expert and testified in several other *Winstar* cases, including *Southern California Federal Sav. and Loan Ass'n v. United States*, 57 Fed.Cl. 598 (2003), *California Federal Bank v. United States*, 43 Fed.Cl. 445 (1999), and *Glendale Federal Bank v. United States*, 43 Fed.Cl. 390 (1999). Professor Horvitz was proffered and accepted as an expert in bank-

ing and finance to testify as to the damages suffered by Citizens as a result of the government's breach of contract.

3. Professor Bernard Black holds a J.D. from Stanford Law School and at the time of trial was a Professor of Law at Stanford. Professor Black has taught classes in corporate acquisitions and corporate finance. Professor Black was proffered and accepted as an expert in corporate finance, corporate management, and corporate mergers and acquisitions. Professor Jeffrey Zwiebel holds a Ph.D. in economics from MIT. Currently a professor of economics and finance at Stanford University, Professor Zwiebel teaches graduate level corporate finance and mergers and acquisitions. Professor Zwiebel was proffered and accepted as an expert in microeconomics, corporate finance, and financial economics.

4. On April 1, 2004, two months before trial, the plaintiff voluntarily dismissed its reliance damages claim, leaving only the above-mentioned lost profits theory for consideration at trial.

REA, Citizens' regulatory capital ratio fell from 10% to 5%. Although Citizens remained in capital compliance, Professor Horvitz opined that Citizens had to forgo growth opportunities until it could regain its 10% capital level. Professor Horvitz explained that, but for FIRREA, Citizens would have leveraged all of the capital it had in excess of 10% and that Citizens would have invested that excess capital in assets that would have generated the same 1.1% rate of return that Citizens had historically received on its actual assets. Using a model that he had developed for the case, Professor Horvitz opined that Citizens lost $20.9 million in profits.

In response, Professors Bernard Black and Jeffery Zwiebel, on behalf of the government, disputed Professor Horvitz's assumption that Citizens would have generated a $20.9 million profit on the additional assets it allegedly would have acquired had it grown during the years in question. Professors Black and Zwiebel explained that Professor Horvitz's model was fundamentally flawed. According to Professors Black and Zwiebel, basic economic theory dictates that Citizens could not have obtained the level of incremental assets that Citizens claimed that it lost at the same 1.1% rate of return that Citizens had historically obtained on its existing assets.

After considering the evidence presented, the court concluded that a trial was needed to resolve the issue of lost profits. *Id.* at 73. A trial was held in June and July of 2004. The evidence centered around the following key factual issues: (1) whether Citizens had a 10% regulatory capital goal; (2) whether Citizens' decision to forgo growth for several years following implementation of FIRREA was related to FIRREA; (3) whether Citizens had to forgo any specific profitable opportunities because of FIRREA; (4) whether Citizens had established $20.9 million in lost profits with reasonable certainty; and (5) whether these lost profits were reasonably foreseeable.

The trial was held over the course of four weeks. Nearly 500 exhibits were admitted into evidence. During this time, the plaintiff called and examined the following witnesses: James Prisby, the President and Chief Oper-

ating Officer of Citizens, as well as Vice Chairman of Citizens' Board of Directors; David Hostetler, a former government regulator, first with the Federal Home Loan Bank of Indianapolis, followed by the Office of Thrift Supervision ("OTS"); Valentine Craig, a government regulator, formerly with the FSLIC, followed by the Resolution Trust Corporation ("RTC"), and currently with the Federal Deposit Insurance Corporation ("FDIC"); Dr. David Glenn, a former government regulator with the FSLIC; John Stephens, who recently retired from employment with Citizens, where he spent twenty years in various positions including Senior Vice President, Treasurer, Executive Vice President, Chief Financial Officer, and member of the Board of Directors; David Mangian, the Assistant Regional Director of the FDIC for the Midwestern Region; Alfred Westfall, a former government regulator with the Federal Home Loan Bank Board, followed by the Federal Home Loan Bank, followed by OTS; Carl Cortopassi, who is recently retired after twenty years as a bank examiner, first with the Federal Home Loan Bank Board, followed by the Federal Home Loan Bank, and finally by the OTS; Michael Mudroncik, who was a bank examiner, first with the Federal Home Loan Bank, and afterwards with the OTS; Thomas Prisby, who, in the more than twenty years since he joined Citizens, has held the positions of Executive Vice President, Chief Operating Officer, President, Chief Executive Officer, and, finally, Chairman of the Board of Directors of Citizens; and Professor Horvitz.

In addition to examining some of the same former government regulators as the plaintiff, the government also called and examined: Alford Wilson, formerly the senior field examiner with the OTS in Indianapolis; Brian McDonald, an examiner with OTS; Stephen Davenport, formerly a thrift examiner with the OTS; Jeffrey Sanders, who was previously a financial analyst with the Federal Home Loan Bank, and subsequent to that, with the OTS; Michael Doebereiner, formerly an assistant director with the OTS; Gerald Skrabala, formerly the vice president of operations at Citizens; Thomas Cleveland, who the government proffered as an expert in

accounting as it relates to the banking industry; Professor Zwiebel; and Professor Black.

## DISCUSSION

When the government breaches a contract, the law requires the government, like any private party, to compensate an injured party for any harm that it has caused. *See United States v. Winstar Corp.*, 518 U.S. 839, 868–69, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). One way that the law endeavors to make the non-breaching party whole is to award him expectation damages, that is, "the benefits he expected to receive had the breach not occurred." *Glendale Fed. Bank v. United States*, 239 F.3d 1374, 1380 (Fed. Cir.2001). Expectation damages generally include lost profits. *LaSalle Talman v. United States*, 317 F.3d 1363, 1371 (Fed.Cir. 2003). The courts have defined lost profits as "profits that would have been earned but for the breach." *LaSalle Talman*, 317 F.3d at 1371; *California Federal Bank v. United States*, 245 F.3d 1342, 1349 (Fed.Cir.2001). The Federal Circuit has stressed that plaintiffs face a heavy burden in proving lost profits in *Winstar* cases. Indeed, the Federal Circuit has explained that proving lost profits is often a hopeless endeavor in *Winstar* cases, stating: "Expectancy damages theory, based on lost profits, has proven itself impractical for these [*Winstar*] cases, and generally not susceptible to reasonable proof.... [G]iven the speculative nature of such a damages claim, ... experience suggests that it is largely a waste of time and effort to attempt to prove such damages." *Glendale Federal Bank v. United States*, 378 F.3d 1308, 1313 (Fed.Cir.2004).

■ Notwithstanding the difficulty of proving lost profits, the theory has not been barred as a matter of law. The Federal Circuit has most recently explained that lost profits are available if a plaintiff can satisfy three requirements: "First, the plaintiff must show that the lost profits were within the contemplation of the parties because the loss was foreseeable.... Second, the plaintiff must establish that there would have been a profit but for the breach.... Third, the measure of damages must be reasonably certain."

*California Federal Bank v. United States*, 395 F.3d 1263, 1267 (2005). As shorthand, the three elements are referred to as: (1) Foreseeability; (2) Causation; and (3) Reasonable Certainty. *See, e.g. Columbia First Bank v. United States*, 60 Fed.Cl. 97, 113, 121 (2004); *Commercial Federal Bank v. United States*, 59 Fed.Cl. 338, 344, 354 (2004). The court will deal with each of these elements in turn.

### A. Foreseeability

■ In order to show that the government knew that its breach due to the enactment of FIRREA would cause Citizens to lose profits, the plaintiff called David Hostetler, Valentine Craig, and David Glenn. These witnesses were government regulators who were involved in the oversight of Citizens during portions of the period between the acquisition of Gary and First Federal and the damages period. The plaintiff called these witnesses for the purpose of showing that the government, through its regulators, either had reason to know, or in fact knew, that the loss of supervisory goodwill and capital credit would reduce Citizens' borrowing capacity and therefore could cause potential economic harm. Mr. Hostetler testified that, generally speaking, when the government made goodwill part of an assistance agreement with an acquiring institution like Citizens, the goodwill was leveraged so that the acquiring institution could take on additional deposits. Tr. at 596–97. When asked whether goodwill was "used for growth purposes," Hostetler replied: "A lot of times, yes." Tr. at 597. Similarly, Dr. Glenn testified that one of the purposes of the goodwill assistance was to give Citizens "the ability to generate earnings, cash earnings, by holding assets over the life of the contract." Tr. at 779–80. Dr. Glenn went on to testify that the goodwill assistance program was "designed to give the institution time" to replace the accounting assets with real assets. Tr. at 782. Finally, Dr. Glenn testified that it was foreseeable at the time of the Gary and First Federal deal that if the goodwill was amortized more quickly than anticipated in the deal, then Citizens' net worth would suffer as a result. Tr. at 826. Finally, Ms. Craig testified that

if Citizens' goodwill were amortized after five years instead of over the course of thirty-five years, then she would expect that Citizens would experience less growth and earn less income as a result. Tr. at 765. The plaintiff argues that these statements, from three government regulators with authority over Citizens during the years in question, indicate that the government had reason to foresee that taking away Citizens' supervisory goodwill and capital credit could cause Citizens to lose leverage and therefore potential profits.

In addition, the plaintiff presented evidence in the form of testimony and summary exhibits for the purpose of indicating that the plaintiff would not have been able or willing to undertake the transaction in the absence of the supervisory goodwill component of the assistance agreement. The purpose of this evidence was to show that, because the goodwill provision was an essential element of the bargained-for exchange, it was foreseeable that breaching this provision would damage the plaintiff. The plaintiff presented evidence that, at the time of Citizens' acquisition of First Federal and Gary, and for sometime thereafter, Citizens would have been insolvent if not for the supervisory goodwill. PX 982. Mr. Stephens testified that, for several years after the acquisition, Citizens would have had a negligible or even a negative capital position if the government had taken away Citizens' supervisory goodwill. Tr. at 934–35. The plaintiff argues that Citizens, which was very concerned about its capital position, would not have entered into the agreement if it was aware that it would be left out of capital compliance as a result. Similarly, Professor Horvitz testified that "Citizens would not conceivably have been interested in doing such a deal because, if they did, they would immediately be subject to being closed themselves the next day." Tr. at 2211–12. Professor Horvitz went on to testify that one of the purposes of the supervisory goodwill was to "assist Citizens in being able to meet their capital targets." Tr. at 2214. See PX 979. The plaintiff argues that, in light of this evidence, the acquisition would have been impossible if not for the goodwill component of the agreement. Because the acquisition would not have taken

place without the goodwill component of the agreement, the plaintiff argues, the government knew that this provision was an essential element of the transaction; as a result, it was foreseeable that breaching this provision would cause the plaintiff to lose leverage and therefore potential profits.

While the government does not dispute that lost leverage can lead potentially to lost profits, the government contends that foreseeability in this case turns on whether the government had reason to know of plaintiff's alleged 10% capital goal and therefore the basis of plaintiff's specific lost profits claim. The government argues that, because Citizens had capital to leverage and was in capital compliance following FIRREA, in order to prove foreseeability the plaintiff must show that the government knew that plaintiff would forbear from growth if FIRREA interfered with the plaintiff's internal capital goal. The government argues that, because Citizens' 10% capital goal was not in place at the time of the 1983 assistance agreement, the plaintiff's damages based on a 10% capital goal were not foreseeable. Gov. Rep. Br. at 7. Specifically, the government points to an admission by Mr. Stephens that Citizens did not establish its 10% capital goal until "after the acquisition of First Federal and Gary Federal," which was, therefore, after the assistance agreement. Tr. at 1229–30. Mr. Stephens went on to testify that Citizens first communicated this goal to government regulators "during the 1988 examination." Tr. at 1234–35.

The government argues that, not only was the 10% capital goal not actually within the contemplation of the parties, but the government also did not have any reason to know that the plaintiff might be inclined, at a later time, to set such a goal. For this conclusion the government points to an admission by Professor Horvitz that Citizens' goal was unique among similar institutions: "Citizens, as distinct from nearly every institution I'm familiar with, they [sic] put enough of a value on that capital goal that they were willing to sacrifice growth in order to—in order to do it. That's a choice that different people with different attitudes towards risk may differ on. But they prized that 10 percent target

and were willing to live with the slower growth that implied during the 1980s to reach it." Tr. at 2228.

While the court agrees with the government that the evidence established that the government did not know or have any reason to know of Citizens' 10% capital goal, the court does not agree that knowledge of the 10% capital goal is necessary to establish foreseeability. The foreseeability test is satisfied so long as the government understood at the time of contracting that the plaintiff would use the supervisory goodwill and capital credit it was given in the assistance agreement to meet regulatory requirements as well as to leverage and thus earn potential profits. As the plaintiff's witnesses indicated, the acquisition would not have been successful if not for the goodwill accounting. The plaintiff has shown that it would not have been receptive to the deal offered by the government had it not included the ability to use goodwill to maintain its capital ratio. In addition, the government regulators testified that it was within the contemplation of the parties that the plaintiff would use the goodwill and capital credit for the purposes of leveraging and growing, with the potential of earning profits. For these reasons, the court finds that the government was aware that the removal of the supervisory goodwill and capital credit before they had been fully amortized pursuant to the assistance agreement could damage the plaintiff and cause it to lose profits. The evidence presented was sufficient to meet the requirements for foreseeability.

The court's conclusion comports with findings by this court in other *Winstar*-related opinions. *See, e.g. Westfed Holdings, Inc. v. United States*, 55 Fed.Cl. 544, 553 (2003) (finding that "it was foreseeable to both parties that a likely result of the removal of the [assistance provisions] would be [the plaintiff's] failure to meet regulatory capital requirement [sic] which would, in turn, lead to the seizure of the thrift."). *See also Home Sav. of America v. United States*, 57 Fed.Cl. 694, 726 (2003) ("Indeed, there was no mystery about how the thrift would use supervisory goodwill. As the regulators had every reason to know, well-run thrifts ... were

very conscious of their capital ratios. The sudden conversion of negative net worth from an asset (supervisory goodwill) to a liability, would, of necessity, force banks to re-evaluate their capitalization."). So long as the government had reason to know that Citizens intended to leverage its supervisory goodwill and capital credit, it had reason to know that if Citizens' supervisory goodwill and capital credit were taken away that Citizens would lose potential profits from leveraging that capital. Citizens has, therefore, satisfied the foreseeability prong of the lost profits test.

### B. Causation

#### 1. Citizens Failed to Prove that it had a 10% Capital Ratio Goal

█ At the heart of Citizens' lost profit claim is its contention that FIRREA impeded Citizens' previously planned growth strategy because it interfered with Citizens' 10% regulatory capital ratio goal. In particular, Citizens contends that, prior to FIRREA's breach, Citizens was working toward and had achieved a 10% *regulatory capital goal* and was about to embark on an aggressive growth strategy in which it planned to leverage its regulatory capital above this 10% target. Citizens contends that this growth strategy was put on hold following FIRREA because Citizens' capital fell from 10% to 5%. Citizens argues that, as a consequence, it had to forgo profits while it rebuilt its capital to a pre-FIRREA 10% level. Citizens further contends that during this capital-rebuilding period it lost growth opportunities that would have generated a $20.9 million profit.

In order to evaluate Citizens' causation evidence, it is important to note the different types of "capital" at issue in this case. Prior to implementation of FIRREA in 1990, Citizens was required to meet certain *regulatory capital* requirements set by the FSLIC. Prior to 1990, Citizens needed to maintain a 3% ratio of capital to assets. In 1989 Citizens had approximately $55.7 million in *regulatory capital*, or 10% of assets. Citizens therefore had a substantial regulatory capital cushion. This regulatory capital included, as noted above, approximately $40 million in unamortized supervisory goodwill and Citi-

zens' capital credit. In 1989, Citizens had *tangible capital* of $15 million, or 2.7% of assets. By the end of 1990, Citizens had tangible capital of 4.98%. DX 2012; DX 2013; DX 2014.

When FIRREA was implemented in 1990, the government imposed several additional capital requirements upon thrifts. Ultimately, thrifts were required to meet core, risk and tangible capital requirements. Citizens acknowledges that it was in full capital compliance following FIRREA, but argues that Citizens nonetheless had to forgo profitable growth opportunities while it worked to increase its regulatory capital ratio to 10%.[5] It is not disputed that during the breach period the minimum core capital requirement was 3%, the risk based capital requirement was 7.5%–8%, and the tangible capital requirement was 1.5%. Upon implementation of FIRREA's regulations in 1990, Citizens was holding capital well above the regulatory minimums. DX 2012; DX 2013; DX 2014. Citizens held core capital of 6.48%, tangible capital of 4.8% and risk-based capital of 15.50%.[6]

In order to prove that Citizens had a 10% regulatory capital goal before and after FIRREA, Citizens presented testimonial evidence from Jack Stephens, Tom Prisby, James Prisby, and Professor Horvitz. Of all the witnesses that Citizens examined at trial, Mr. Stephens was the only one that testified that he had personal knowledge of Citizens' 10% regulatory capital goal. Tr. at 1237. However, Mr. Stephens could not point to any document written during the years either leading up to or following FIRREA in which a 10% capital goal was stated. Specifically, Mr. Stephens admitted that he could not point to any committee meeting minutes, business plans, or any other internal docu-

ments that reflected any capital goal. Tr. at 1238. Similarly, James Prisby admitted that there is no reference to a "10 percent regulatory capital goal that Citizens had" from January 1989 through June 1990 in any committee meeting minutes or Board of Directors meeting minutes. Tr. at 425–26. James Prisby went on to admit that he was not even aware of any specific capital goal, or if there was a capital goal, what that goal was. Tr. at 294–96. Tom Prisby, likewise, admitted that if there was a capital goal, it was not a fixed goal. Tr. at 1991. Specifically, when asked if Citizens' business plans focused on achieving a 10% capital goal, Tom Prisby stated: "I can't be specific. But 7–1/2 percent was a number I used.... It could have been 9, it could have been 10. It could have been 7–1/2 to some extent." Tr. at 1991.

Despite hearing these admissions at trial, Professor Horvitz testified that Tom Prisby had told him that Citizens had a 10% capital goal. Tr. at 2426. Professor Horvitz also claimed that Citizens' behavior subsequent to the enactment of FIRREA proved the point. Specifically, Professor Horvitz testified that Citizens started to grow once it reached a 10% regulatory capital ratio in 1993. Tr. 2250–51. However, Professor Horvitz could not point to any contemporaneous document indicating that Citizens in any way acknowledged that it reached a 10% capital ratio or that it planned to change its investment strategy after reaching 10% regulatory capital. Tr. at 2454. Professor Horvitz also admitted that he was not aware of any documentary evidence to show that Citizens had a 10% regulatory capital goal. Tr. at 2424–25.

In response to Citizens' witnesses, the government presented the testimony of Mr. Cleveland, an accounting expert,[7] who stated

---

5. More specifically, Citizens decided to increase capital by acquiring assets without acquiring offsetting liabilities. In general, Citizens elected not to grow its deposits but rather to acquire assets with the profits earned on its existing assets.

6. In 1991, Congress passed the Federal Deposit Insurance Corporation Improvement Act of 1991, Pub.L. No. 102–242, 105 Stat. 2236 ("FDICIA"), which identified several levels of capitalization and set forth criteria for "well," "ade-

quately," and "under-capitalized" thrifts. It is not disputed that at all times following implementation of FDICIA Citizens was considered "well-capitalized." Tr. at 1219.

7. Mr. Cleveland received an MBA from the University of Michigan. He went on to work for the accounting firm of Touche, Ross & Company where he helped form a banking group. He became the national director of all banking services, including work in tax, consulting, auditing, and accounting. Mr. Cleveland later served as

that, after reviewing all of Citizens' business plans and public documents, he could not find evidence that Citizens had a 10% regulatory capital goal either prior to or following FIRREA. Tr. at 3025–27. Mr. Cleveland testified that if Citizens in fact had a capital goal, it was probably a GAAP capital goal, or possibly a tangible capital goal, neither one of which was affected by FIRREA. Tr. at 3023. The only mention of a 10% capital goal in any Citizens-related document appeared in the March 13, 1998 Conversion Appraisal Report prepared by an accounting firm in connection with Citizens' conversion from a mutual thrift to stock ownership in 1998. PX 41. In the "Strategic Discussion" of the Conversion Appraisal Report, the accounting firm explained Citizens' capital strategy for the decade from 1983, when it acquired First Federal and Gary, until 1993, as follows:

> For the next decade [following the acquisitions of First Federal and Gary], the focus of management was on increasing the Bank's *tangible capital* and restructuring the balance sheet. Citizens Financial was largely in a 'no growth' mode over this time frame as it sought to increase earnings, maintain the customer base, and build the *tangible capital-to-assets ratio to approximately 10 percent.* During this period, the Bank sought to restructure the balance sheet with the objective of more closely matching the repricing structure of assets and liabilities and reducing the Bank's interest rate risk exposure. The result of the operating strategy over this period led to a high proportion of assets in securities, particularly mortgage-backed securities ("MBS") with laddered maturities.

PX 41, page CT 0041048 (emphasis added).

Based on his reading of PX 41 as well as Citizens' business plans, Mr. Cleveland opined that removing supervisory goodwill and the capital credit from Citizens' regulatory capital did not affect Citizens' measure of capital; it did not interfere with Citizens' effort to meet either a 10% *tangible capital goal* or a 10% *GAAP capital goal.* Tr. at 3023–24. Thus, Mr. Cleveland concluded

that while he did not believe that Citizens had a specific capital goal above regulatory minimums, to the extent Citizens had a capital goal, the goal was not affected by FIRREA. Tr. at 3023–24. Based on his conclusion that FIRREA did not change any capital goal that Citizens might have had, Cleveland opined that FIRREA's breach did not cause Citizens to change its business strategy. Cleveland further opined that Citizens' decision not to grow and seek additional profits immediately after FIRREA was not based on capital concerns per se but was based on Citizens' business judgment regarding the opportunities available at the time. Tr. at 3031.

The government also presented the testimony of Professors Black and Zwiebel regarding Citizens' alleged 10% regulatory capital goal both before and after FIRREA. Both testified that an analysis of Citizens' growth history demonstrated that Citizens did not forbear from opportunities because of adherence to a 10% capital goal that existed either before or after FIRREA. The evidence demonstrated that in 1990, following implementation of FIRREA, Citizens in fact grew by 3.5%. In addition, the evidence established that after Citizens reached its alleged 10% capital goal in 1993, it began to grow slowly and never maintained a 10% capital ratio thereafter. Tr. at 3599. Professors Black and Zwiebel opined that this evidence tends to show that Citizens' growth strategy was not tied to any 10% capital goal.

Taking all of the relevant evidence into account, the court finds that Citizens did not prove that it had a 10% regulatory capital goal prior to and following FIRREA. Particularly important to the court's finding is the fact that neither James Prisby, the President and Chief Operating Officer of Citizens, nor Thomas Prisby, the Chairman of the Board of Citizens, were aware of the alleged 10% goal. The court found it highly probative that neither James Prisby, Thomas Prisby, nor Jack Stephens, the Chief Financial Officer of Citizens, could point to any document prepared by Citizens either prior to or following FIRREA that indicated that there was a 10% regulatory capital goal. Citizens' Assets/Liabilities Committee Meeting min-

---

CEO and CFO of several thrifts and savings and loan associations. Mr. Cleveland was proffered

and accepted as an expert in accounting as it relates to the banking industry.

utes, Business Overviews prepared by Citizens in 1991, 1992 and 1993 ("Overviews"), and all the other internal documents of the thrift were very detailed and thorough. The court is persuaded that, if a 10% capital goal existed, then some internal document would have mentioned it. The court finds it difficult to believe that a capital goal, if any existed, would not appear in at least one of Citizens' internal documents over the years, particularly because these internal documents addressed the thrift's operations with such a high degree of specificity. For instance, the 1993 Overview set forth such mundane goals as "relaminate countertop" and deal with "food odors." The court is persuaded that Citizens did not have a 10% regulatory capital goal.[8] Thus, the court finds that FIRREA did not cause Citizens to forgo growth and potential profits because Citizens wanted to rebuild its capital ratio to 10% of assets.[9] Because Citizens was in full regulatory compliance following FIRREA, because it was able to maintain a cushion above all regulatory minimums, and because it did not have a specific capital cushion governing its business strategy, Citizens was free to grow after FIRREA. Indeed, as Mr. Stephens testified, the court is convinced that Citizens' decision not to grow after FIRREA was based on Citizens' "independent business decision." Tr. at 1221. FIRREA's breach, therefore, did not cause Citizens to lose profits on the ground that Citizens could not grow until it rebuilt its capital ratio to 10% of assets.

### 2. Capital Concerns did not Prevent Citizens from Pursuing any Specific Investment Opportunities

■ The court has also considered Citizens' additional evidence that FIRREA di-

rectly interfered with Citizens' ability to pursue specific business opportunities. In particular, the plaintiff's witnesses testified that Citizens was not able to pursue the acquisition of other institutions because of capital concerns raised by FIRREA's new capital requirements. Citizens' witnesses also discussed various loan products and expansion efforts from which it had to forbear following FIRREA because of similar concerns. For the reasons discussed below, the court finds that Citizens did not prove that it lost any profits due to capital concerns that kept Citizens from pursuing specific investment opportunities.

First, the plaintiff presented documentary evidence in the form of business plans from the early 1990s as well as testimonial evidence, most notably from Thomas Prisby and James Prisby, which indicated that Citizens did not pursue mergers with other institutions because such mergers might dilute its capital.[10] In its Overviews, Citizens' management reported that: "Mergers will be limited. A local institution willing to merge will be explored only if there is no dilution of capital. Mergers will not actively be sought. Although RTC acquisitions have been evaluated in the past, future explorations will be minimal. Historically sales have brought serious diminishment of capital to acquiring institutions." *See, e.g.* 1991 Overview, PX 305. The 1992 and 1993 Overviews contain nearly identical statements. *See* PX 309; PX 312.

With regard to these statements in the Overviews, Tom Prisby explained that: "We were at a seriously low level of capital in terms of the requirements at that point in

---

8. The court heard substantial testimony regarding the reasonableness of a 10% capital cushion in the thrift industry. However, because the court finds that Citizens did not have a 10% regulatory capital goal, it is not necessary for the court to consider Citizens' claim that a 10% regulatory capital goal provided a reasonable "capital cushion."

9. *Because the court has determined that Citizens did not have a 10% capital goal, it does not address, in the section on causation, whether Citizens' alleged lost growth would have inevitably led to lost profits. This issue is addressed at*

length in the reasonable certainty section of the opinion. The court notes, however, that proof of lost leveraged growth does not necessarily prove lost profits. As set forth in the section on reasonable certainty, the court finds that Citizens did not prove that the incremental growth it claims to have lost because of FIRREA would have generated any profit. *See infra* part C.

10. Citizens did undertake a merger with another thrift, Anchor, during this period. Citizens argues that this merger was acceptable to it because it did not dilute its capital position.

time. We would not have sought anything that would have brought any dilution to capital." Tr. at 1928. As a consequence, the plaintiff argues that Citizens lost the opportunity to acquire one of the many institutions being offered by the government for sale through the RTC during the post-FIRREA period. Mr. Prisby testified that these RTC sales included some thrifts that Citizens would have considered purchasing but for the breach and the concomitant reduction of Citizens' regulatory capital. Tr. at 1937–1946. Mr. Stephens also testified as to lost merger opportunities.

Although Mr. Prisby and Mr. Stephens identified several institutions that Citizens allegedly considered acquiring, neither could point to any contemporaneous evidence tending to show that Citizens actually engaged in calculations to determine whether acquiring a particular institution would have, in fact, caused Citizens to fall below acceptable capital levels. The testimony confirmed that Citizens never approached the RTC regarding any specific acquisition nor did the RTC ever reject any application by Citizens for any acquisition. Therefore, there was no evidence introduced to suggest that a merger would not have been approved because of concerns for Citizens' capital level.

Furthermore, Citizens did not present any evidence to prove that acquiring any of the institutions on the RTC list would have been profitable. Professors Black and Zwiebel presented compelling testimony to show the premiums that are normally paid to acquire institutions like those on the RTC's list place into doubt whether Citizens would have made a profit for many years, if ever, from acquiring one of these institutions. Tr. at 3199; 3210–11 (Statement of Zwiebel); Tr. 3790–1 (Statement of Black).

Professor Horvitz did not counter the assertions of Professors Black or Zwiebel regarding premium payments. Although Professor Horvitz testified regarding a hypothetical acquisition and suggested that such an acquisition would be profitable, he did not present any evidence to show that any of the RTC institutions that Citizens was allegedly thinking of acquiring could

have in fact generated profits during the damages period.

Citizens also failed to establish how FIR-REA caused Citizens to lose profitable opportunities outside the arena of RTC acquisitions. For example, James Prisby testified that there was a "virtually unlimited" supply of mortgage-backed securities to buy. Tr. at 255. However, in contradiction to this statement, James Prisby also testified that he could not recall any "specific growth opportunities" that Citizens had to forgo because of FIRREA. Tr. at 464.

Citizens also failed to prove that its decision not to offer potentially more lucrative products, such as higher interest rate fixed-price mortgages was caused by FIRREA. Tom Prisby stated that Citizens used to offer 30 and 15 year fixed-price mortgages to customers before FIRREA; after FIRREA, Citizens became concerned about offering long-term, fixed-rate obligations. Tr. at 1756. Mr. Prisby testified that Citizens stopped offering these products for the years 1990, 1991, and 1992, the years immediately following FIRREA. Tr. at 1759–60.

Mr. Prisby's testimony, however, must be examined in light of contemporaneous documentary evidence that undercuts his explanation of why Citizens ceased offering 15 and 30 year fixed-rate mortgages. In its 1992 Overview, Citizens states that it is "restricted by sound GAP management to adjustable products." PX 309. Citizens' 1993 Overview contains identical language. PX 312. The court also heard testimony regarding the uncertainty surrounding interest rates during this period. In addition, Mr. James Prisby testified that he couldn't recall whether FIRREA was a bar to any sort of lending opportunities that Citizens otherwise would have taken. Tr. at 464. From these contemporaneous statements in Citizens' Overviews, and the testimony received, the court may infer that Citizens' decision to stop offering fixed rate products which were potentially more profitable was not caused by FIRREA, but was instead part of Citizens' larger business strategy, including a legitimate concern about fluctuating and unstable interest rates during the early 1990s.

The evidence established that Citizens' rejection of other business opportunities was also driven by considerations not directly related to FIRREA. For instance, when testifying about Citizens' 1990 business plan, Mr. Tom Prisby admitted that Citizens decided not to pursue a trust operation or a security brokerage operation, because these lines of business were "not something we wanted to spend the money on." Tr. at 1753. In this regard, it is important to note that Mr. Tom Prisby did not say that Citizens was *unable* to spend the money on these activities due to capital constraints, but rather it was making a business judgment to forgo these opportunities. In other words, Tom Prisby had determined that these lines of business would not be sufficiently profitable to warrant the investment of capital.

The government's witnesses confirmed that Citizens' decisions to not to pursue business opportunities following FIRREA were not based on capital concerns. In this connection, Professor Zwiebel testified that Citizens in fact had opportunities to improve its capital position but did not pursue these opportunities. Professor Zwiebel noted that if Citizens sold certain bad loans that it had acquired, then it would have increased its capital ratio. Tr. at 3226–28. Although Citizens' witnesses testified that it would not have been profitable to sell these loans, they did not dispute that Citizens could have improved its capital position by selling these loans, yet failed to do so. Similarly, Professor Zwiebel testified that Citizens could have converted to a stock institution earlier if Citizens had wanted to improve its capital position following FIRREA. Professor Zwiebel inferred from Citizens' behavior that the reason Citizens did not seek to raise additional capital was because Citizens did not perceive that there were sufficiently profitable opportunities available to warrant a capital infusion. Tr. at 3245–47.

Finally, the court rejects Citizens' contention that FIRREA caused Citizens to forgo growth opportunities because Citizens was worried generally about the regulatory climate following FIRREA. Citizens notes that it was warned by regulators that it was "marginal" and that in 1990 the regulators had downgraded Citizens' capital rating from "1" to "2." More generally, Tom Prisby testified about the uncertain regulatory environment after FIRREA that prompted Citizens' conservative strategy: "there was constant pressure to meet certain standards.... [After FIRREA there were c]onstant conversations of, again, confiscation, special assessments, mutuals having more capital than they needed, all of that conversation.... It was a changing regulatory environment. It was very undeterminable in terms of where the future was. And this existed from '83 [onward]." Tr. at 1775–76.

The court finds that Citizens' alleged concerns about its regulatory health following FIRREA did not cause Citizens to forgo profits. The evidence offered by the government at trial paints a very different picture of Citizens' regulatory health. As opposed to many other institutions, Citizens did not receive a lot of attention from regulators post-FIRREA. Tr. at 2891–92. Citizens was considered, in the words of a government regulator, to be a "well-run shop with good capital, conservative.... Low risk.... The institution was well managed." Tr. at 2897.

With the foregoing in mind, the court finds that Citizens' contention that FIRREA caused Citizens to forgo profitable business opportunities fails for lack of proof. Although there is no doubt that Citizens' regulatory capital was reduced following FIRREA, the plaintiff has failed to prove that Citizens failed to make investments because of the reduction in its regulatory capital following FIRREA.

### 3. Conclusion on Causation

In order for a court to find lost profits, the plaintiff must prove that "the profits are such as would have accrued and grown out of the contract itself, as the *direct and immediate results* of its fulfillment." *Wells Fargo v. U.S.*, 88 F.3d 1012, 1023 (Fed.Cir.1996) (emphasis added). The Federal Circuit has now made it plain that the breach must be more than a "substantial factor" in causing lost profits. *Cal. Fed.*, 395 F.3d at 1268 [11]. The

11. The plaintiff's reliance on several earlier cases

in this court that applied a "less exacting" "sub-

plaintiff must be able to prove that "but for the breach" profits would have been made. *Id.* at 1268. For the reasons set forth above, the court finds that Citizens failed to satisfy the "but for" element of causation; that is, Citizens has failed to prove that but for FIRREA it would have leveraged a set amount of capital in an effort to make additional profits. Citizens did not prove that it had a 10% capital goal which precluded it from growing following FIRREA. To the contrary, the court is persuaded that Citizens' growth strategy after FIRREA was not tied to a specific capital ratio goal. The plaintiff's claims regarding a 10% goal were not supported by any documentary evidence and were not credible. Citizens failed to prove that FIRREA interfered with a pre-FIRREA growth strategy.

In addition, Citizens failed to prove that FIRREA caused it to forgo any specific business opportunities because of capital concerns. Citizens did not prove that it considered and rejected any specific merger with an institution on the RTC list because of capital concerns. While there was some general reference to concerns about Citizens not wanting to "dilut[e] capital" there is no contemporaneous evidence to show that Citizens evaluated any specific merger to determine whether it would jeopardize Citizens' capital position to the detriment of its relationship with its regulators. The testimony of the regulators persuaded the court that Citizens' financial soundness was never in question after FIRREA and that Citizens would have been free to pursue mergers after FIRREA.

Further, Citizen could not identify any other areas of business that it did not pursue because of capital concerns following the enactment of FIRREA. James Prisby could not identify a single investment Citizens did not or could not make because of FIRREA. The evidence also established that Citizens' decision not to offer certain loan products or other financial services was based predominately on interest rate concerns. Thus, the court finds that Citizens' decision to forgo any investment or pursue other avenues of business was based on its belief that these investments were not worth the financial risk. In other words, the court infers from the evidence presented that Citizens' decision not to pursue various business opportunities following FIRREA was based on its independent business judgment and was not caused by the loss of regulatory capital.

In this connection, Citizens' assumption that the loss of leveragable capital necessarily means that Citizens lost profits is not supported. Leverage only gives rise to *potential profits*. Leverage also has the potential for losses if the rate spreads are negative. Therefore, whether to use leverage to grow turns on a variety of practical factors which are evaluated as are all other business decisions. While capital position is always a consideration in the banking industry, it is not necessarily the predominant concern where, as here, the thrift is in capital compliance and operating well above all regulatory minimums standards. Citizens failed to prove that concern with its capital position following FIRREA dominated its business decision-making. Instead, the court is persuaded that Citizens did not grow or pursue various business opportunities immediately following FIRREA because Citizens did not believe that those opportunities would be profitable or worth the risk. For these reasons the plaintiff has failed to prove causation, a required element of a lost profits claim.[12]

## C. Reasonable Certainty

■ Having concluded that Citizens failed to establish causation, the court's inquiry would ordinarily be at an end. Nonetheless, even if the court were to find that Citizens established causation, for the reasons set

---

stantial factor" test is misplaced following the Federal Circuit's decision in *Cal. Fed.* In *Cal. Fed.* the Federal Circuit expressly rejected the "substantial factor" test. *Cal. Fed.*, 395 F.3d at 1268.

12. Because the court has concluded that Citizens failed to establish causation, the plaintiff's sug-

gestion that the court find that Citizens would have grown at least to the same extent as its "peer" group but for FIRREA fails. For all of the reasons discussed above, the court concludes that Citizens failed to prove how FIRREA kept plaintiff from growing to the same extent as its peer group.

forth below the court finds that the plaintiff failed to prove lost profits with reasonable certainty; thus its lost profits claim must fail on this ground as well.

In order to prove that it is entitled to $20.9 million in lost profits, the plaintiff relies on the damages model authored and explained by Professor Horvitz and on the factual testimony, primarily, of the Prisby brothers and Jack Stephens. At trial, Horvitz presented a lost profits model that calculated how much profit Citizens allegedly lost between the time of the breach, in 1990, and when Citizens converted from a mutual thrift to a stock corporation in 1998. The plaintiff does not seek damages beyond the time of conversion.[13]

Professor Horvitz's model hinges on two major assumptions. The first is that the plaintiff had a 10% capital goal and would have leveraged all of its regulatory capital above that goal to obtain assets. The second is that Citizens would have received the same rate of return on these incremental assets as it had historically achieved on its existing asset base. The uncertainties associated with both of these assumptions are fatal to the plaintiff's claim.

### 1. Citizens Did Not Have a 10% Capital Goal or a Business Strategy for Significant Growth

As discussed in detail above, the court has concluded that Citizens did not prove that it had a 10% capital goal. The court cannot accept the assumption made by Professor Horvitz that Citizens' business strategy was driven by a plan to leverage all of its capital over a 10% capital target. Therefore, a damages model based upon a 10% capital goal is by its terms without value.

The court has also found that Citizens' decision not to leverage its excess capital following FIRREA was not based on concerns with its level of capital but rather was based on other business factors. In this connection, the court cannot accept that Citizens would have grown at the rate assumed by Professor Horvitz in his model. Professor Horvitz's model assumes that Citizens would have grown by nearly 20% and would have acquired over $100 million in additional assets in the first year following FIRREA. The model assumes that Citizens would have acquired over $350 million in assets in just a few years. These growth assumptions are wholly speculative. There was absolutely no contemporaneous evidence in any of Citizens' business plans either prior to or following FIRREA that suggests that Citizens would have or could have expanded its asset base by that amount. Citizens grew at an annual rate of 1.5% to 4.4% in the three years prior to FIRREA. It also grew only at a modest rate after reaching a 10% regulatory capital ratio. Given Citizens' history, the growth assumptions in Professor Horvitz's model strain credulity and therefore raise serious concerns about the reliability of Professor Horvitz's model.[14]

### 2. Horvitz's Assumptions about a Guaranteed Return on Incremental Assets Were not Supported

In order to support this economic model, Professor Horvitz explained that he assumed, for purposes of his model, that Citizens would acquire assets in the same percentages as those which it held in its actual asset portfolio at the time of the breach. Although Professor Horvitz made this assumption in his model, he acknowledged that both the growth rate and rate of return on assets were assumptions that needed to be supported by real world facts in order to be reliable. He testified that "one can't simply

13. Professor Horvitz opined that, due to the conversion, Citizens reached the size it would have attained but for the breach; consequently, he testified that Citizens would not have accrued additional damages beyond this point in time.

14. Professor Horvitz endeavored to explain that Citizens might have been able to achieve this same level of growth through an acquisition. It is not disputed, however, that Professor Horvitz's model was not based on an acquisition. In addition, as discussed above, the court was not persuaded that an acquisition would have been profitable. Professor Horvitz's model did not present any credible evidence to establish that an acquired institution with an existing portfolio of assets and liabilities would have been able to generate the guaranteed 1.1% return on assets, which is at the heart of Professor Horvitz's model.

assume that they would get the assets or that—assume that they would earn the same return. I think ... it's legitimate to question the modeling on the basis of: Are those assets available, and what would the returns be? I think it takes evidence as to where they would come from and what they would yield." Tr. at 2310.

While Professor Horvitz recognized the importance of examining available assets and yields, he did not present any evidence to support the asset and yield assumptions in his model. Aside from providing the court with general testimony regarding the "limitless" availability of various mortgage-backed securities, Professor Horvitz never explained exactly how Citizens' asset portfolio would be structured. Professor Horvitz did not think it mattered. He asserted that "regardless of what that combination of assets is," the thrift would still earn a 1.1% rate of return. In fact, Professor Horvitz testified that Citizens would have been able to earn the same 1.1% rate of return if it invested entirely in mortgage-backed securities and had acquired them with only jumbo CDs. However, he presented no evidence to show which mortgage-backed securities were available during the forgone-asset period and whether Citizens would have been willing to accept the level of risk associated with those securities.

In this connection, the court is mindful of the testimony it heard from James Prisby, who was responsible for Citizens' investment strategy. Mr. Prisby agreed with Professor Horvitz that Citizens could have purchased a "virtually unlimited" amount of mortgage-backed securities. Tr. at 255. However, he later admitted that these assets did not always offer a satisfactory return: "I'm not saying that the spreads were always where we would have liked them to be." Tr. at 521. The limited evidence the court received regarding mortgage-backed securities did not provide the court with a level of certainty regarding the availability of specific securities which would have yielded Citizens a profit, taking into account the cost of raising those funds. The court did not receive any evidence to show what specific investments could have been made and what the yields would have been. Without this evidence, the court does not have confidence that there were mortgage-backed securities available in the volume alleged and with yields that would support Professor Horvitz's assumed guaranteed rate of return.

The court was also persuaded by the testimony of Professors Black and Zwiebel, who both explained that Professor Horvitz's model ignored basic economic principles. In brief, Professors Black and Zwiebel testified that there is no economic support for a model that assumes a guaranteed 1.1% rate of return regardless of the growth rate. They explained the issue as follows: if Citizens began to search for more and more assets to purchase, it would first purchase the highest quality assets, that is, those with the highest rate of return for the least amount of risk. However, there are not an unlimited amount of assets of the highest quality. Therefore, as Citizens attempted to continue to deploy its capital, it would be forced to purchase riskier assets or those which offer a lower rate of return. Tr. at 3144. Professor Black explained that it is for this reason that Citizens' expected return on its incremental assets would be increasingly smaller than the rate it actually received on the assets it already owned. Tr. at 3639.

In view of these expert opinions, the court takes exception with James Prisby's testimony that the plaintiff would have earned more profit with more capital because it could then have invested in riskier securities and received a higher rate of return. In short, Mr. Prisby's statement reveals the fundamental flaw in Horvitz's model. If an investment has a higher potential yield than a comparably available investment, it is only because it is concomitantly more risky and therefore more likely to generate a loss. Conversely, if there are two investments, one of which is more attractive than the other because it has a higher expected yield at the same level of risk, all incoming investment will flow to the better-paying investment until demand for it increases, driving up the cost of purchasing it, thus making it no more profitable than the other investment.

In view of the foregoing, the court agrees with Professors Black and Zwiebel that Professor Horvitz posited a hypothetical world in

which Citizens is able to take advantage of investment opportunities that persist indefinitely above a market rate without diminishing returns: in short, it is modeled to have a guaranteed rate of return for an unlimited deployment of assets. The model is therefore flawed. Indeed, in the real world the evidence established that once Citizens began to grow that it did not maintain a steady rate of return. Instead, it decided to purchase some riskier investment with the inevitable consequence that it suffered some losses.[15]

In short, Professor Horvitz could have posited a 1.1% return on assets, or he could have posited unlimited growth, but he cannot assume both of these elements in the real world. The result of Horvitz's flawed model is that there is no limit to growth and to profit. Citizens could, in Horvitz's model, continue to leverage and grow and earn profits, guaranteed profits, without end.

The flaws in Professor Horvitz's model become most apparent if we assume that Citizens had less than a 10% capital ratio. Professor Horvitz admitted that, if Citizens had a lower capital goal than the 10% goal he assumed, then Citizens' lost profits would increase exponentially. Tr. at 2387–89. If Professor Horvitz had used an 8% capital goal, then Citizens would have lost $48,000,000 in profits under Professor Horvitz's model. If Citizens had a 4% capital goal, then it would have lost profits of $257,000,000. Lastly, and to drive the point home, if Citizens had leveraged all of its assets according to Horvitz's model, retaining no capital, its lost profits for an eight-year period would be infinite. Tr. at 3276. Any model that could yield such an absurd result cannot be reliable.

### 3. Conclusion on Reasonable Certainty

The court finds that the above-cited problems with Professor Horvitz's lost profits

model are enough to defeat Citizens' claim for lost profits in this case.[16] Citizens failed to prove lost profits with the degree of certainty required to support an award. The court is cognizant of the fact that when a "reasonable probability of damage can be clearly established, uncertainty as to amount will not preclude recovery." *Cal. Fed.*, 395 F.3d at 1267. However, the plaintiff must still be able to prove that the measure of damages sought is "reasonably certain." *Id.*

Here, because of the above-discussed flaws in Professor Horvitz's model, Citizens failed to meet its burden. First, Professor Horvitz's model was based on the unsupported assumption that Citizens had a 10% capital target. The court found that Citizens did not have a 10% capital target. Second, Professor Horvitz's model assumed a growth rate that was not consistent with Citizens' generally conservative business plans. Nowhere in any pre-FIRREA business plan did Citizens indicate that it was contemplating the nearly 20% growth rate in 1990 that Professor Horvitz relied upon in his model. Third, Professor Horvitz could not identify with any specificity which investments, whether mortgage-backed securities or other assets, would have guaranteed Citizens the 1.1% rate Professor Horvitz assumed in his model. Without offering any specifics, Professor Horvitz simply assumed that there would have been attractive mortgage-backed securities or other opportunities available to Citizens in a world absent FIRREA. Fourth, Professor Horvitz's model did not comport with basic economic principles. The model erroneously assumed that Citizens could grow to any size and still maintain a guaranteed 1.1% profit.

The flaws which have led this court to conclude that Citizens failed to prove lost profits with reasonable certainty are consistent with other decisions of this court which

---

**15.** For example, in 1997 Citizens took a loss on a real estate investment which Citizens had hoped would generate a return greater than the return it received on average. Tr. at 3812–15.

**16.** Given the court's conclusions regarding Professor Horvitz's model, it is not necessary for the court to consider the government's additional objections to Professor Horvitz's model. For example, the government objects to Professor Hor-

vitz's failure to consider the impact of an economic recession during the early 1990s. The government also contends that Professor Horvitz included capital in the hypothetical world that would not have existed, including supervisory goodwill that would have otherwise been written-down. It is not necessary for the court to consider these other methodological flaws.

have held that absent proof of specific investments that would have been held in the world absent FIRREA, a lost profits claim is too speculative. *See, e.g., Long Island Sav. Bank v. United States,* 60 Fed.Cl. 80 (2004) (holding that·damages may be too speculative if a plaintiff is unable to "point to actual profitable opportunities that it has foregone."); *Standard Fed. Bank v. United States,* 62 Fed.Cl. 265 (2004); *Southern Nat'l Corp. v. United States,* 57 Fed.Cl. 294 (2003); *Fifth Third Bank of Western Ohio v. United States,* 55 Fed.Cl. 223 (2003). The *Fifth Third* plaintiff's expert calculated lost profits in that case "as the product of the incremental assets and the incremental return that the But-for Bank would have earned." *Fifth Third,* 55 Fed.Cl. at 228. The expert postulated that the bank's "expanded asset base would realize profits at a similar rate to that of its actual profits." *Id.* at 241. The court found that the model's

> outstanding flaw is the assumption that the But–for–Bank would, even if it could, engage in the same type of activities without identifying any specific investments or opportunities, and that these activities would produce the same results ... as the actual business activities in which plaintiff engaged.... This deficiency renders plaintiff's model speculative as a matter of fact and law.

*Id.* at 241.

In a similar case, *Southern National Corp. v. United States,* 57 Fed.Cl. 294, 304–305 (2003), the court found that its expert report suffered from the same infirmities as the expert report in *Fifth Third.* Particularly, the *Southern National* court found that its plaintiff's expert's model was too speculative

because it assumed that the rate of return on the incremental assets of the but-for bank would parallel the thrift's actual past earnings. *Id.* at 305.

This court made similar determinations in *Standard Federal.* In holding that the plaintiff's claim for lost profits was too speculative, the court relied on the following facts: 1) the lost profits model assumed that the plaintiff would have grown in the same way and profited at the same rate as it did in the pre-breach world; and 2) the lost profits model assumed that the institution would have engaged in the same types of investments as it had in the but-for world, without identifying these specific investments. *Standard Federal,* 62 Fed.Cl. at 279–80, 285.

Most recently, the court in *LaSalle Talman* reached the same conclusion on similar facts. In rejecting the lost profits claim, the court stated, "We conclude that the twin uncertainties of both the amount and composition of foregone assets and the hypothetical rate of return preclude recovery under plaintiff's earnings-on-foregone-assets projection." *LaSalle Talman v. United States,.* Similarly, in *Southern California,* the court rejected another model presented by Professor Horvitz, in part, because Professor Horvitz's assumption that incremental assets would yield a fixed rate of return was not supported. *Southern California,* 57 Fed.Cl. at 625–27.

In view of this overwhelming authority, Professor Horvitz's model does not provide the court with a reasonably certain measure of lost profits.[17] Nor did Citizens provide the court with any other means of determin-

---

17. Because the court has already found that Citizens did not establish causation, there is no need to address plaintiff's plea for a "jury verdict" award. If the plaintiff had proven that lost profits were caused by the government's breach, then this court would have been authorized to return a so-called "jury verdict." "In estimating damages, the Court of Claims occupies the same position of a jury under like circumstances; and all that the litigants have any right to expect is the exercise of the court's best judgment upon the basis of the evidence provided by the parties." *Bluebonnet Sav. Bank v. United States,* 266 F.3d 1348, 1357 (Fed.Cir.2001) (citing *Specialty Assembling & Packing Co. v. United States,* 174 Ct.Cl. 153, 355 F.2d 554, 572 (1966)). Consistent with the above admonition, however, a jury verdict is allowed only if "there was clear proof of injury and there was no more reliable method for computing damages-but only where the evidence adduced was sufficient to enable a court or jury to make a fair and reasonable approximation." *Bluebonnet,* 266 F.3d at 1357. A jury verdict is not utilized until "clear proof of injury exists." *Dawco Constr., Inc. v. United States,* 930 F.2d 872, 880 (Fed.Cir.1991) (reversed on other grounds). Where, as here, Citizens failed to prove an injury, the jury verdict method is not appropriate.

ing lost profits with reasonable certainty. As a result, the claim must be rejected.[18]

## CONCLUSION

In conclusion, the plaintiff has failed to prove that the breaching provisions of FIR-REA caused the plaintiff to lose profits. Accordingly, the Clerk shall enter judgment for the government.[19] Each party will bear its own costs, except that the government shall be awarded costs in connection with Citizens' reliance damages claim. In particular, the government is entitled to the costs it incurred in defending against Citizens' reliance claim for the period following issuance of the court's 2003 opinion until the time at which Citizens abandoned the claim prior to trial.

---

**18.** Because Citizens failed to prove damages, it is not necessary for the court to address the government's contention that Citizens also failed to mitigate damages.

**19.** The outstanding motions in this case are hereby resolved as follows: The plaintiff's June 14, 2004 Motion for Leave to Include an Additional Exhibit is GRANTED only as to Appendix A and Appendix B, which are composed of excerpts from the Code of Federal Regulations. The plaintiff's June 14, 2004 motion is otherwise DENIED. The plaintiff's July 6, 2004 Motion to Strike DX 2071, DX 2072, DX 2073, DX 2079 and Related Testimony of Professor Jeffrey H. Zwiebel is DENIED. The government's July 4, 2004 Motion for Judgment upon Partial Findings is DENIED as MOOT. The plaintiff's August 20, 2004 Motion to Correct the Trial Record is GRANTED. The plaintiff's May 19, 2004 Motion to Exclude the Black–Zwiebel Regression Analysis is GRANTED. The analysis was not relevant and not considered by the court. The plaintiff's June 9, 2004 Motion for Leave to Amend Plaintiff's Trial Exhibit List is DENIED. The plaintiff's May 19, 2004 Motion to Exclude Opinions of Professors Black and Zwiebel that Exceed the Scope of their Expertise are hereby DENIED. The court found both the testimony of both experts' helpful, relevant, and within the scope of their expertise to the extent that it helped elucidate the flaws inherent in Professor Horvitz's model. The plaintiff's August 19, 2004 Motion to Strike Certain Testimony of Professor Bernard S. Black is DENIED. All other motions not specifically addressed in this opinion are hereby DENIED.